L&M Agency v. Avis Rent A Car Systems Inc. Good morning. May it please the court, my name is Raul Munchie and I have the privilege of representing the appellant in this action, L&M Agency Inc. I would like to reserve three minutes for rebuttal. Very well. By way of very brief background, at issue in this case is a civil rights action brought under 42 U.S.C. 1981 by the appellant, L&M Agency Inc. L&M was owned and operated by an African-American married couple, Lakeisha and Leonard McClain. They entered into an agreement with Avis in 2003 to run a car rental agency out of King of Prussia. In 2011, December 2011, Avis terminated the operator agreement as a final act of discrimination and retaliation against the McClains. On March 23, 2015, the lower court, the Honorable William for Avis on the 1981 claim. And that's the decision that's currently on appeal before this court. Now, despite the voluminous briefing and extensive record in this case, which I'm sure you all are used to, what's actually at issue here is a very straightforward issue regarding well-settled fundamental law of this circuit. At issue is the lower court's conclusion from this court on the N.O.S.E. precedent from civil rights actions on summary judgment. There are three issues in particular that I'd like to highlight today. First, the lower court made a critical error on summary judgment in finding that the appellant was unable to present sufficient evidence of pretext to warrant the denial of summary judgment. Now, the court reached that conclusion even though the court itself found that the appellant cast substantial doubt on the vast majority of the reasons given by Avis for why they terminated this agreement. But they only, under our case law, there only has to be one legitimate, non-discriminatory reason to justify the termination. And the district court worked very diligently through each one of the reasons, acknowledged either his view that they were not necessarily those worthy of, quote, credence, which is the language from the cases, because they weren't relied upon by the decision maker. Or, at least in the issue of the cleanliness of the facility, there was a difference of opinion about that. But then when you turn to the profit issue, we'll call it the financial issue, there the district court concluded that there was no evidence of pretext. Your Honor is absolutely correct that the court went through a thorough analysis of the various reasons that were given by Avis in this action and concluded that the vast explanation of what the law is with regard to these various reasons, because we can look right at the Fuentes decision from 1994, this court, and what's often cited by employers and defendants in this case is a particular section of Fuentes, which says that, well, you need to challenge each proffered reason. And then there's the footnote that says. But then there's the major footnote, exactly. Footnote seven from that opinion explicitly states that when the employer or the defendant raises a bagful of reasons for termination. And I would say in this case, when you raise 11 different reasons for termination, that's a bagful. But let's talk about those reasons. The reasons that were set forth, I gather you're referring to the interrogatory response as being the, quote, bagful, right? The laundered residue. Along with the rest of it, yes. Right? And then what you say along with the rest, but if you look at each of those interrogatory responses, putting aside the telephone, this issue about whether the telephone technique was used appropriately, each of them are either supported by other things in the record, maybe not relied upon by the decision maker, like the uniform issue, which wasn't relied upon by the decision maker, but it wasn't new, it wasn't created post hoc, the filing of the lawsuit. Each one of those at least has some support that preexisted the termination, that someone was concerned about it on the part of Avis. So I know the footnote you're talking about, I completely understand why you're drawing it to our attention, but is this really that kind of scenario, where these explanations for the most part were supported, or in the case of the financial, which I'd like to go back to, was relatively longstanding and raised by someone other than Ms. Mancini, the person who, as I understand your theory, being sort of the instigator of the improper conduct? Well, let me try to unpack that a little bit here, because the fact that they did raise 11 different reasons is important in this particular issue where we are right now on appeal, because the lower court itself went through the analysis. The lower court itself went through the reasons and found that some of the reasons were unsupported by the record, some of the reasons were disavowed by the actual decision maker under oath when he testified as to what actually motivated his decision. The standard is not what could have been the reason for the termination decision, what they could have dug up about performance or other issues that could have led to termination. That's not the standard. In all of these cases, these civil rights cases, either employment discrimination under Title VII, 1981, the issue is what motivated the decision. Well, one of the things that was, I'm sorry, go ahead, real quick, I'll go back to the financial. One of the reasons that was motivated was the financial reason that was pointed out by Ms. Long months before, it was pointed out at other points in time, so we know that financial reason exists, right? We know that existed pre, and we know it was relied upon by the decision maker. I don't agree with that, actually. Yeah, so he talked about poor revenue. In his deposition testimony, there is testimony that states that he did not look at certain numbers until after the decision was made. This is on page 100 of his deposition testimony where he's talking about, well, what actually led to this decision. He says primary reason, filth, primary reason is cleanliness of the facility. I'd like to go back to the financial, though. Sure. Okay? The financial is a reason given for the determination, whether you look at it in the letter of termination that was in response to the overture by counsel for the plaintiffs, or you look at the interrogatory response, and it was not brushed aside by the decision maker, but there was this reason. The only explanation or retort that I saw in the record about this was a claim by a representative of L&M saying that the computers weren't appropriately registering his information, weren't working right. That's only a part of it. The rest of the record also shows that when you're looking at gross revenue, you're looking at the revenue of this particular place compared to the other ones run by Avis. Within their territory, which is broad, they were one of the highest revenue streams. I understand that, but my point is the explanation given for why the CSIs were low was because the computer wasn't doing something right, but all the other numbers were strong. How could the computer be problematic for one subject area, but not for the rest? Well, the issue with the CSI goes beyond just the computers because the CSI was a goal that was given by Avis. They give all of their territories and all of their branches various goals to try to reach. Here, there were, I believe, 52 different rental car agency facilities that were subject to that goal. How many of them actually met the goal? Seven. How many actually were terminated for not meeting that goal? One. Is there something in the record that would tell us some of the others were terminated? Yes. I believe that's undisputed, actually, that the only facility that was terminated in that year within this – we're not talking nationwide, we're talking about generally this territory – was this one. That's the only one. Okay, thank you. I'll let Judge Vanasky ask his question. I'm sorry, Judge. Well, I was just clarifying, it's Mr. Osborne who's the decision maker? Correct. All right. He is listed as the decision maker, and his testimony is very important, and this goes into what the lower court actually went through in this analysis. Everything here comes down to credibility, and this is where this Fuentes footnote comes in. What we're talking about is when a defendant's reasons for termination are challenged by the plaintiff, their credibility is put in question, and that is something for the jury to decide. The court erred here in a variety of ways, but most fundamentally, they made credibility determinations, resolved factual disputes in favor of Avis, weighed the evidence. Those are things black-letter law under the Third Circuit, you just can't do. This is supported by Third Circuit precedent. I'm not making this up. If we look at Fuentes, of course, if we look at Abramson versus William Patterson College, the same issue is talked about when we're talking about credibility. Once certain proffered reasons are sufficiently challenged, what you have to do is say, all right, now it's the jury's decision, because a jury may decide, Avis just put up 11 different reasons for termination, 10 of them are unworthy of credence or unsupported by the record, false in one, false in all. A jury may decide, actually, I don't know the reason for this termination, and it may very well be discrimination. That is the summary judgment standard, and that is what was ignored by this court. Could you touch on the retaliation argument? Are you pursuing that also? The retaliation argument is there as well, and what the court did, as opposed to the discrimination argument, the court actually found there was no prima facie case of retaliation. Incorrect, because there is a cause of connection for a variety of reasons that you can prove retaliation a variety of ways under Third Circuit precedent. Direct evidence, circumstantial evidence, temporal proximity, pattern of antagonism. Here in this case, we go through this in our brief in detail, the pattern of antagonism here. Comments made by the district manager. The pattern between the dates of the two letters. Between the dates of the two letters, there were comments that were made by the district manager. There were other actions taken that the court, unfortunately, completely disregarded. When we're talking about comments, how do you tie that antagonism into the decision maker? The decision maker antagonism was between Mancini and McClain's. How do you tie that to the decision maker Osborne? It was a statement that the overall decision maker, the ultimate decision maker, was Mr. Osborne. The interrogatory responses say that Ms. Mancini played a role there. So it wasn't just an insulated incident where it was just Mr. Osborne. Ms. Mancini is a player in this situation as well. She's the district manager for years. The comments that she's making from the get-go, from the first time that she meets the McClains, could potentially have evidence of a racial bias, which a jury has to conclude. When she's talking about the fact that the McClains are from Chester, Pennsylvania, that could be used as a proxy for race as Mr. McClain explained it. Ms. Mancini knows about Chester. She knows about the demographics there, that it's 75% African American. She tells him about a traumatic experience that he had there, that she had there when she was in high school, that led to her leaving the area. She made comments about a song and dance that Mr. McClain allegedly would do in terms of making excuses. Is it your position that those stray phrases are of a racial connotation? My position is that the jury can conclude that they are. The fact that the lower court took that opportunity from the jury, that's the error that needs to be reversed. In 2012, when Sarah Palin made a criticism of President Obama that he was shucking and jiving, why did she get in trouble for that? Why was she criticized for that? Historically, traditionally, those are certain coded race words, code words, under the Third Circuit decision in Amman, A-M-A-N, code words are important. A jury has to be able to hear the evidence and decide for itself as to what exactly was determining and motivating this decision. That's what it all comes down to, their credibility. When they're offering reasons that have been challenged, when they're offering reasons that shift and change over time, as the court recognized, and I want to emphasize that part of it, the court did all the legwork. I would say, to use a football analogy, and my time is running out, but this last point, to use a football analogy, which I think is apropos for this time of year, the court took the ball and drove it all the way down the field and then fumbled it right on the one yard line. It did the hard work and then took the credibility and determination for itself instead of the jury. Thank you very much. Thank you. Mr. Halas? Am I pronouncing that correctly? Yes, Halas. You're on. Halas, okay. May it please the court, my name is Paul Halas from the firm of Dave Pitney and I represent That would tie back into that football analogy, George Halas, the robber. Yes. He was a great coach, so hopefully I have as much success today as he did then. This case arises out of a decision by Avis to terminate a commercial agreement with another company called L&M Agency. There are two issues presently before the court. First is whether or not there were competent evidence presented by the plaintiff to establish pretext and secondly whether or not a prima facie case for retaliation was established. I'd like to make a few points regarding both of those issues, but first I'd like to also just reiterate what this case is not about. It is not a personal claim for racial discrimination by Mr. McClain. He was neither an employee nor was he even the principal or shareholder or owner of L&M. I believe counsel stated that the business was owned by a couple and Avis entered into agreement with the couple, but in fact what happened here is that Avis recruited an employee, Ms. McClain, from a different agency and helped her establish her own business and it was not until a few years later that Mr. McClain entered into the business. Is there anything in the record that Ms. Mancini played any role in Ms. McClain establishing L&M? Not that Ms. Mancini, I don't believe that Ms. Mancini was involved in that particular aspect of it. In fact, I don't believe that Ms. Mancini played much of a role in connection with the whole hiring and recruiting process for agents. That was left to other people and I think that's critical when you start looking at things that were presented by plaintiffs like it's statistical evidence, but I was trying to make the point that there were a few handful of African American operators that were replaced with white operators and there was some insinuation that Ms. Mancini played a role in that replacement when, in fact, I think the record is clear that she did not play a role in that hiring process. Would you agree we're in footnote 7 land? I would agree there's an attempt to use footnote 7 in flint days to create this bag fill argument in this case, but I doubt it. The interrogatory, right? The interrogatory that was prepared in this case identifies several reasons. One of the reasons it doesn't identify is the filth, as it were. It also walks, and his deposition, Osborne's deposition, I believe is Osborne, the decision maker in this case, later walks away from two of the reasons identified in the interrogatory, the telephone techniques and uniforms. What do we make of that? Well, the interrogatory does specify that it was terminated for failure to provide satisfactory performance and a failure to abide by company standards and policies, which required cleanliness and in fact... He does get that, but given the tenor of his deposition, where the cleanliness was a very big issue to him, it wasn't itemized in the interrogatory, correct? Not itemized beyond the broad category of satisfactory performance, there's no reference to it. Right? There's no reference to the cleanliness, as it were, or lack thereof, of the facility. And he walks away from the telephone techniques and uniforms during the deposition, doesn't he? Well, I think in his deposition, he was testifying as to what really motivated him at that point in time to make the termination decision. But he signed the interrogatory and was the deposit, and deposed. So how do you, I mean, his own, he's, I understand he's signing on behalf of Avis when he signs the interrogatories, but nonetheless, as Judge Restrepo was mentioning, he himself, the reciter of the interrogatory response and the answer at the deposition is not consistent, is he? Well, when you talk about consistency, there would be potentially a conflict between what's said in one and what's said in the other. I don't believe that there is a conflict between what's stated in the interrogatory answer and what Mr. Osborne testified to in his deposition. He may have focused on core facts in his deposition that really are not disputed in this case. This is not a situation where, for example, an employee's told at the time he's being reduced in force, and therefore you're being terminated, and later on a completely inconsistent and different reason, for example, a performance issue comes up, and then that is the reason. In the interrogatory, he identifies telephone techniques, and at his deposition at page 513 of the appendix, he says, I don't recall when asked about the telephone techniques. He gives the same answer with respect to the uniforms. That's not a contradiction in your world? I don't know if it's a contradiction or if these are additional examples of satisfactory performance that played into the entire record that he had before him. That would be a little bit unusual, though, if those are examples of satisfactory performance for not to list the most egregious instance of satisfactory performance, the cleanliness of the facility. I'm not sure if that was the most egregious element of satisfactory performance. It all boils down to... Wasn't that Mr. Osborne's primary reason? It was one of three, I believe. One being the failure to perform with respect to the CSI numbers, and that was a key financial goal that was intended to promote dryness... Cleanliness and hostility between Mancini and the McLeans. I'm sorry, Your Honor? The third issue was the hostility between the McLeans and Mancini. It wasn't necessarily just with Ms. Mancini. I think there was evidence of an acrimonious relationship between the companies, between L&M and Avis Budget. If the local district management, including Ms. Mancini and Ms. Long and Mr. Sweeney, the other local management, could not engage in a professional manner with the L&M folks, then there would be no reason for them to continue the relationship. What do we make of the fact that the district judge found that L&M had sufficiently called into question the cleanliness issue as perhaps being pretext? You're saying at least there's a factual question about whether it was dirty or not. Well, I believe the district court gave credence to the fact that cleanliness played into Mr. Osborne's ultimate decision. It did make another statement earlier in its opinion where it stated that there could be an issue of fact that he said, she said type of situation. There could be or there was. Didn't the plaintiffs, as it were in this case, contradict the assertions that the facility was dirty? There was evidence in contemporaneous documents that it was not clean, not kept properly. In his deposition, Mr. McLean indicated that that was not the case. It was a he said, she said situation. But that sort of issue of fact... Is that the sort of thing a jury typically has to decipher? Well, if that were the only thing that this entire case depended upon, then perhaps so. But the fact that the cleanliness issue could have been potentially clouded by an issue of fact doesn't take away from the fact that there were other core facts here that fed into the decision. Let's go to the CSI issue. The fact that only... Is it accurate that only seven of the agencies or locations were meeting the AVIS goal? Doesn't that play into whether this could be a pretext for discrimination? Well, I think what was more important to Mr. Osborne was the fact that L&M was near the very bottom of, I believe, 55... But it wasn't the very bottom, so did the very bottom get terminated as well? I'm not sure what the trend was with those other agencies at the very bottom, but for L&M, clearly it had gone from a fair performer down to one of the bottom performers. Did anybody else get terminated based on the CSIs? I believe the counselor correctly stated that that particular year there was no other... So that would be correct. The only facility terminated based on the CSI numbers was this one. I think it's the district court pointing out... Yes or no? Correct. Okay. But it was more than just that one fact. It was a combination of that fact... Well, Osborne had three factors. The district court says on the cleanliness issue, that's an issue of fact, because it's disputed as to whether it was unclean or not. On the CSI issue, we have only one agency terminated. They were near the bottom, but they weren't even the very bottom. And the third issue is this hostility, which could be racially motivated. Let me turn back to the cleanliness issue, because I think it's broader than just cleanliness. It goes to the condition of the premises and how it was used. Mr. Osborne was the decision-maker. He went actually out to the site the week before this confrontation took place. There is no dispute between the parties that Mr. Osborne saw various personal items in the location that he felt were not proper under the party's agreement, and he asked that they be removed. Let me go back to this interrogatory, which reads, describe in detail each and every reason asserted. Show me where those are discussed in the interrogatory. I believe, Your Honor, that it would be covered by failure to abide by company standards and policies. He itemized others, but he didn't itemize the critical issue in his worldview in the interrogatory. That's what you're telling me. That interrogatory was not that detailed. It does detail. It details telephone issues, which he disavows at the deposition. It details uniform issues, which he disavows at the deposition. So there was some detail in it. There's no reference to the filth, as it were. Right? No? Not using those words? No words. It doesn't say dirty, unclean. It doesn't say anything about it. Again, it does say failure to abide by company policies. How do you reconcile that with his deposition testimony at page 516, where he says the primary decision was the location filth? That was a big deal to him. It was a big deal to him. It doesn't reference it in his interrogatory. It's not referenced in the interrogatory, again. I submit to you, and I concede that it's not listed specifically in the interrogatory. But I believe that, you know, if a decision is made based upon a failure to abide by the terms of the agreement, I don't believe it's necessary to actually spell out what goes into that. The question says describe in detail. Right? That's the question that was presented to your client, and that's the answer he gave. That's right. Provide in detail. As further expounded upon at his deposition. If I could just ask about the CSI issue, which I think Judge VanAskey was also asking about. No others were terminated, and the record suggests that L&M's record explanation for perhaps why the numbers appeared low was because there were computer issues. After the termination, the record shows that new computers were being brought in and that a white operator was going to take over the facility for L&M. How can, should a jury be able to consider that fact to determine whether or not the financial reason was worthy of credence? Your Honor, I don't believe there's any tie in the evidence between the failure to allegedly properly upload the CSI numbers and the subsequent replacement of the computer system. All of the operators had the same computer system with respect to reporting the CSI numbers at that point in time. Mr. McClain does complain that he did not have the training or the ability or there was some obstacle to his uploading that, but it was not a one-time complaint by him. The record is clear that there were attempts to try to train him on this, including right up until Mr. Osborne's visit. So your understanding of the record is it wasn't a equipment problem, it was a training issue? No, I believe that the allegations regarding the equipment are made in connection with some argument that the subsequent replacement operator had been given better phone systems or the place was cleaned up for them and not him. I see. Thank you. And in that point, the conditions with the building, which are also cited as a potential issue, it's clear from the record that most, if not all of them, were the responsibility not of Ms. Mancini, who's alleged to be the bad actor here, but instead the responsibility of the landlord. But there were improvements made after there was a change in operator, correct? There were some improvements made, but, for example, I think the evidence is clear that with respect to the phone upgrade, the company had a schedule for when it was going to be replacing phones, and simply because Mr. McLean and Ms. McLean's location had not yet reached the point where they were due for a new phone system, I think it's unfair to try to... Is there anything in the record that would tell us that? I believe it's in the record. I believe Ms. Mancini testified to it. I'm not sure if that particular page got into the transcript. Thank you. One other point I'd like to make. Counsel attempted to argue that the CSI numbers were really an after-the-fact sort of imagination by Mr. Osborne, and he cites to page A516 of the deposition of Mr. Osborne. I think it's clear there, if you read that, that Mr. Osborne is speaking about other financial performance indicators were looked at following the termination, not CSI, and that he had looked at those. In fact, I believe that Mr. McLean conceded in his deposition that CSI was brought up when Mr. Osborne came to visit in November 2011. So are there no other questions? Again, I keep coming back to this interrogatory. For instance, Osborne is asked, did the plaintiff's telephone techniques play any role in your decision to terminate the agreement? And he says no. How do you reconcile that with the interrogatory? Your Honor, I believe that you're correct that there are things in the interrogatory that are broader and that which Mr. Osborne didn't necessarily state when he was pinned down on it in a deposition. He's not pinned down? Okay, I get it. Thank you. Thank you very much. If I can start right there on the contradictions, I think it's pretty clear on the record that there are contradictions. What about the fact that Mr. Osborne comes, I guess, on November 3rd and is not happy with the condition of the facility and asks that certain items like the laundry bag or something like that and other personal items be removed, and he shows up a week later and there's no dispute. They're still there. No dispute that there was a conversation about removing some personal items from the agency. That is correct. There is a major dispute as to whether or not Mr. Osborne stated that that would be grounds for termination, that he was upset in any way about that. Is there any dispute that they were not removed? There is no dispute on that, Your Honor. You are correct there. But what's really going on here is that when Mr. Osborne comes in and states that cleanliness, that filth, is the primary reason, and the lower court acknowledges that they are saying cleanliness, filth, is the primary reason, and then also goes through, as Judge Rusrepo just went through, the interrogatory responses and the inconsistencies, and the lower court itself finds that these things can't be sweared, it reached the wrong legal conclusion. It got right to that one-yard line. And we can talk about the contradictions all day long, but what I really want to emphasize is, well, what does that mean? What's the significance of it under Third Circuit law? It means that credibility is being determined by the lower court, which you can't do on summary judgment. If this case is presented before a jury, and Mr. Osborne is right there on trial, he's on the witness stand, and he starts answering some of these questions about CSI sales or revenue, he turns beet red, he starts drinking water, he is sweating profusely. Well, a jury can read into that and make a determination as to whether or not they think a person is telling the truth. That type of opportunity was stolen from the jury by the district court, unfortunately, in this case. The case is actually very similar in some ways to a recent Third Circuit case, which is non-presidential, Johnson v. Delaware County Juvenile Detention Center, 545 Fed Apex 135. It's non-presidential, but Judge Schwartz, you were on that panel, and what happened in that case was the panel decided that the lower court itself found genuine issues of material fact regarding the reasons given for termination, and because there were challenges to that proffered reasons that were sufficient, well, then there was pretext, and the case should not have been granted on summary judgment. Same thing that's going on here. The lower court itself went through the various reasons, looked at the primary, quote-unquote primary reason, determined for itself correctly that it was based on disputed facts and conflicting testimony, and then just fumbled it at the very end, stating, well, in any event, I don't think a jury should be able to hear this case. And that's not what the Third Circuit says, and the Third Circuit actually says, and the Supreme Court, clearly, once there are grounds for disbelieving the proffered reasons, which the court found, and a prima facie case of discrimination, which the court found, together they can have a finding of discrimination and they warrant the denial of summary judgment. Thank you very much. Thank you. Again, we heard great arguments this morning. We'll take this case under advisement.